IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

SHAWN MONTEGIO,

Petitioner/Defendant,

v.

UNITED STATES OF AMERICA

**MOTION TO REINSTATE DIRECT APPEAL RIGHT AND TO RESOLVE OR PRESERVE COLLATERAL CLAIMS UNDER THE AEDPA PURSUANT TO 28 U.S.C. § 2255**

Now comes Pro Se Petitioner, Shawn Montegio, before this Honorable Court for the resolution of ineffective assistance of counsel claims under the above styled caption.

## THE AEDPA AND § 2255 TIMELINESS OF COLLATERAL CLAIMS

The AEDPA's clear language governs the one year period to submit a § 2255 motion and that time begins to run from the day Petitioner's case became "final". For the purposes of timeliness, the instant case became "final" when the 10 day appellate window closed, (not counting weekends and holidays), and Petitioner's attorney failed to file the requested appeal notice pursuant to Fed. R. App. P. 4. Petitioner was sentenced on April 4, 2005. The AEDPA one year period expires on April 16, 2006. More importantly, Petitioner must marshal all his claims of collateral error in his first § 2255 motion. Pratt v. U.S., 129 F.3d 54, 63 (1st Cir. 1997) (AEDPA governs first § 2255). Therefore, Petitioner's § 2255 claims are timely before this court.

## CLAIMS PRESENTED

CLAIM ONE: Ineffective counsel failed to file requested direct appeal notice.

CLAIM TWO: The voluntary and intelligent character of Petitioner's guilty plea.

CLAIM THREE: The Prosecutor's breach of plea agreement.

CLAIM FOUR: Breached plea invalidated guilty plea.

CLAIM FIVE: Sentencing errors.

CLAIM SIX: Rule 11 Violations

CLAIM SEVEN: CONSTITUTIONAL ISSUES

BACKGROUND FACTS AND PROCEDURAL CASE HISTORY

In late 2002, members of the High Intensity Drug Trafficking Area Task Force (HIDTA), an inter-agency law enforcement task force designed to investigate drug trafficking, began an investigation of numerous individuals in the Central Falls, Rhode Island area. These individuals were allegedly involved in large scale drug trafficking operations. The group was led, allegedly, by the Defendant, Shawn Montegio.

In connection with this investigation, the Rhode Island State Police, with the assistance of the United States Attorney's Office, obtained two consecutive warrants for wiretaps on cellular phones owned by Shawn Montegio. The wiretap warrant applications were supported by affidavits from Assistant United States Attorney Kenneth Madden and Rhode Island State Police Detective Kevin O'Brien. The wiretap warrants were signed by Chief Judge Ernest Torres of this court on November 15, 2002 and January 10, 2003.

On Saturday, February 8, 2003 at 12:30 pm an audio record ing of a wiretap conversation took place between Defendant and unidentified individuals in which the parties agreed to the terms of the drug transaction. The parties agreed on the price, the quantity, and the quality of the cocaine which was being purchased by the defendant from his supplier. In this conversation it was agreed that the unidentified individuals from New York would arrive at around 5 p.m. on Sunday, February 9, 2003 and the speaker from New York indicated that the transaction would occur "there".

The agents learned through these intercepts that the anticipated transaction was going to take place around 5:00 p.m. February 9, 2003. The government, in anticipation of an arrest and subsequent search of the residence the following day, prepared an application for a search warrant including affidavits supporting the application. However, during the next 30 hours, no effort was made to obtain the warrant.

On February 9, 2003, but before the events leading to the surveillance and arrest of the Defendant, Special Agent Michael Kohn of the FBI called AUSA Mary Rogers and advised her about the ongoing telephone intercepts. Special Agent Kohn further advised AUSA Rogers of the fact that the subjects from New York would be arriving at a later time, about 7:30 p.m.. Receiving that information through an intercepted conversation. At about 5 p.m. on February 9, Special Agent Kohn met with Detective O'Brien and went to the office of the US Attorney to meet with AUSA Rogers. They arrived at the US Attorney's office at about 6 p.m. Strangely enough, they began the process of completing the information in the search warrant application, completed the day before. O'Brien and Kohn left the US Attorney's office at about 7 P.M. and returned to the Central Falls area.

At this point in time, officers had not made any effort to contact Magistrate Judge Martin to present search warrant application.

Around 7 p.m. Detectives Reilly and Branch observed a grey

Hyundai with Virginia license plates pull up to the residence and park in front of it. Two men exited the vehicle. One wore a white shirt or jacket, and the other wore a black jacket.

The two individuals walked into the residence. Minutes later they exited the house and drove the grey Hyundai into the driveway. The car disappeared from view as it backed into the driveway behind a white fence-like gate that shielded the major portion of the driveway from the street.

Seconds after backing the car into the driveway, the two men emerged from the driveway. The man in the black jacket was carrying a duffel bag which appeared heavy. The two walked together to the entrance and entered the residence at about 7:10 to 7:15 p.m.

At approximately 8 p.m., Detectives Reilly and Branch received information that another call had been intercepted from the defendant to one of his close associates, Julio Jaiman. In this conversation between Defendant and Jaiman, the Defendant told Jaiman that he would call him in about half an hour to come and see him and to see something. Jaiman's residence was also under surveillance by law enforcement, but Jaiman did not leave his residence at any time during this period.

Sergeant DelPrete made the decision to order the forced entry of the house even though no search warrant had been obtained. Although the residence was surrounded and all participants outside the house were under direct surveillance, DelPrete expressed misgivings that there were already two unknown male subjects inside 45 Claremont Street residence. Adding a third subject,

Jaiman, to this already tenuous mis-en-scene made DelPrete uncomfortable. Furthermore, DelPrete was concerned that the surveillance would be detected by Jaiman. He noted that officers had observed someone pass by the residence on two occasions; this, he believed, indicated that the Defendant would move the drugs quickly from the residence to other locations. When this rapid transfer did not occur between 7:15 and 8:20, DelPrete thought the drugs might be discarded. He also expressed concern about the likelihood of firearms in the residence, recalling an earlier reference by the Defendant to the purchase of a silencer. Finally, the criminal history of the Defendant and the fact that he was known to be involved with drugs and violence worried him as well. A call was subsequently made to AUSA Rogers informing her of law enforcement's decision to conduct a forced entry to the residence.

Shortly thereafter, at 8:30, Branch and Reilly received instruction from Sergeant DelPrete, the ranking officer in the task force and its leader, to leave the van in order to conduct the forced entry into the house.

At this point, approximately 8:30 p.m., Detectives Reilly and Branch as well as numerous other members of the HIDTA task force, converged on the front entrance of 45 Claremont Street. Detective O'Brien knocked and announced that state police were at the door. Within several seconds, the door was breached using a ramming device. There was a second door into the residence which was also battered open.

The first person through the door was Detective O'Brien, followed by Detective Reilly. They entered the kitchen and

immediately observed a large quantity of cocaine stacked on the kitchen counter areas and a carton in the kitchen sink. The Defendant and the two other subjects were immediately in front of them. All three subjects began running to the other side of the kitchen towards the bathroom area as Reilly shouted, "State Police"! Reilly ran to the left side of the kitchen island in the direction that the three subjects had gone. He saw that the Defendant had entered the bathroom area and that the man with a dark shirt was also attempting to enter the bathroom. The Defendant was shutting the bathroom door on this man. Reilly moved the man in the dark shirt aside and entered the bathroom, where he grabbed the Defendant on the right shoulder and took him to the ground. The Defendant was at that moment throwing a semi-automatic pistol into the toilet. Reilly handcuffed the Defendant and retrieved the handgun from the toilet. The handgun was fully loaded with a round in the chamber, meaning that it did not need to be cocked before it could be fired.

Resting on the kitchen counters in neat stacks was over $100,000 in cash. Kilogram wrappers for the cocaine were in the sink, in the process of being rinsed. Also, in plain view in the kitchen were an electronic scale, a sealer and nine stacked kilograms fo cocaine.

The Defendant was advised of his Miranda Rights and Detective Reilly asked whether he understood those rights, Montegio nodded in affirmative. Approximately fifteen to twenty minutes later, while he was still in the bathroom, the Defendant made statements to the effect that, "in another hour you guys would not have even gotten me", and that "this is nothing, what

you're seeing here. It might be big for around here in Rhode Island but this is nothing compared to what I can do."

At this point, the house and evidence was secured. All three men, Defendant and the two subjects who arrived in the Hyundai, were arrested and held. Montegio's wife, Maria Benavides, was also in the residence with their four children. Benavides and the children were detained by Sgt. DelPrete.

After the residence was entered, either Kohn or O'Brien once again called AUSA Rogers to inform her that the residence had been breached by force and the evidence secured and to inform her that Kohn and O'Brien were on their way back to the US Attorney's office to complete the already completed search warrant application of February 8, 2004. The two arrived at the US Attorney's office at approximately 8:45 p.m. After again completing the application, which O'Brien signed, all three proceeded together to the home of Magistrate Judge Martin. They arrived there at approximately 9:00 p.m. Magistrate Judge Martin then reviewed the information presented in the application for between 45 minutes and an hour. He signed the search warrant at 10 p.m. After returning to the US Attorney's office to drop off AUSA Rogers and make copies of the warrant, they returned to 45 Claremont Street to conduct a search and seize the items listed above which had been <u>previously</u> secured.

At approximately 10 p.m., officers at 45 Claremont Street received notification that a search warrant had in fact been issued. They then conducted a search of the residence. Incident to this search, officers seized the secured nine kilos of cocaine, the secured $100,000 plus in case, some paperwork, a

a heat sealing device, wrappings in which the cocaine was packaged, kilogram wrappings, and paperwork showing that the residence was in the custody of Shawn Montegio and Maria Benavides.

Petitioner was transported to the State Police substation, processed and held overnight.

On February 10, the US Marshall Service transported Petitioner before Magistrate Judge for his initial appearance. Petitioner was represented by retained counsel, Peter P. D'Amico and John J. Belivacqua.

On February 12, 2003, Petitioner was indicted on Four Counts. See Exhibit 1: Indictment.

On February 13, 2003, Petitioner was arraigned, pled not guilty as charged and held without bond. The record reveals multiple docket entries as Petitioner proceeded towards trial.

On June 27, 2003 Petitioner submitted a pretrial motion to suppress evidence derived from wiretap warrants, warrantless entry, arrest, search and seizure under Fruits of Poisonous Tree Doctrine.

On July 11, 2003, Petitioner's motion for a Franks hearing was denied. A motion to suppress hearing was held.

On July 25, 2003, a memorandum and decision granting, in part, denying, in part, was rendered. The court denied the motion to suppress the seized evidence and warrantless entry; and suppressed Petitioner's statements at time of arrest.

## CLAIM ONE

## FAILURE TO FILE REQUESTED DIRECT APPEAL NOTICE

The Sixth Amendment to the Constitution provides, in pertinent part, that "[i]n all criminal prosecutions, the accused shall...have the assistance of counsel for his defense. Although, ineffective assistance of counsel is a term of art, the Supreme Court made the existence of an implicit Sixth Amendment Constitutional right to effective assistance quite clear in a number of their decisions. McMann v. Richardson, 397 US 759 (1970); U.S. v. Cronic, 466 US 648 (1984); Strickland v. Washington, 466 US 668 (1984) (Two prong test); Lockhart v. Fretwell, 506 US 364 (1993) (Fairness and reliability).

## PETITIONER'S INEFFECTIVE ASSISTANCE OF COUNSEL

Petitioner asserts his retained counsel, John V. Bevilacqua, failed to file a notice of appeal from his conviction and sentence despite his specific request.

The case law governing a federal criminal defendant's direct appeal is well settled in this circuit. A person deprived of the right to a direct appeal in a criminal case "through the dereliction of his counsel" must have a new appeal regardless of whether he can demonstrate the existence of any viable appellate issue. Bonneau v. U.S., 961 F.2d 17, 23 (1st Cir. 1992) (Citing Rodriguez v. U.S., 395 US 327, 330 (1969).

Moreover, the First Circuit Court of Appeals further recognized that "the failure of counsel to prosecute an appeal

in the abscence of waiver by the defendant or compliance with Anders v. California, 386 US 738, 744 (1967), is a per se deprivation of the right to counsel. Wilbur v. Maine, 421 F.2d 1327, 1329 (1st Cir. 1970). "This is [so] because a federally convicted defendant has a right to a direct appeal from his conviction. Coppedge v. U.S., 369 US 438, 441 (1962), as well as the constitutional right to effective counsel on that appeal. Evitts v. Lacey, 469 US 387, 396-398 (1985), rights which are denied when counsel fails to and without defendant's knowledge to perfect the appeal. U.S. v. Tajeddini, 945 F.2d 458, 467 (1st. Cir. 1991).

## THE SENTENCING RECORD

The Court: You have a right to appeal your conviction if you feel your guilty plea was somehow unlawful or involuntary, or thre was some other fundamental defect in the proceeding that was not waived by your guilty plea.
You may also have the right to appeal your sentence under certain circumstances particularly if you think the sentence I've imposed is illegal.
See Exhibit __10__ : Sentencing Transcript at page 62, lines 15 to 22.

## THE APPEAL REQUEST

At the completion of sentencing, Petitioner requested his attorney to file the appeal notice and appeal his conviction and sentence. Attorney Bevilacqua stated, he would do so. See Exhibit __2__ : Petitioner's sworn declaration attesting to factual events that occurred "off the record". More importantly, the record clearly reveals, not only did his attorney fail to file the appeal notice, he also failed to submit an "Anders" brief. Furthermore, his attorney failed to inform Petitioner about advantages or any disadvantages of appealing his conviction and sentence.

The district court held 3 separate but continuous sentencing hearings before it rejected the initial presentencing report and accepted the prosecutor's new version of additional facts in support of an increased sentence. Although, Petitioner's attorney objected to the new facts not included in the plea agreement or colloquy, the court imposed a 248 month sentence.

After sentencing, Petitioner requested his attorney appeal the conviction and sentence. Attorney Bevilacqua stated, he would do so. Petitioner, through several telephonic communications requested the filing status of his appeal, however, Bevilacqua failed to file the appellate notice in the district court.

Rule 12 of the rules governing pleadings clearly states, Petitioner's pleading must be accepted as true and correct unless contradicted by the record. Moreover, where the record is silent, an evidentary hearing is required to ensure Petitioner received his one full fair § 2255 proceeding.

## PREJUDICE

The standard for judging any claim of ineffective assistance of counsel is "whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result." **Strickland,** Supra, 466 US at 686. A sentence may be vacated due to ineffective assistance if (1) Counsel's performance fell below an objective standard of reasonable professional assistance, and (2) The Petitioner was prejudiced by the deficient performance. Id at 687.

The Supreme Court in Roe v. Flores-Ortega, 528 US 470 (2000) described the proper application of the Strickland test to claims alleging counsel was unconstitutionally ineffective for failing to file a notice of appeal. First, the reviewing court must establish whether the defendant made a specific request for counsel to file an appeal, and if a specific request was made, whether it was disregarded by counsel. If counsel failed to follow a specific request to file an appeal, counsel acted in a per se unreasonable manner. If the court finds that Petitioner did not make a specific request, the court must

then determine whether the attorney consulted with Petitioner concerning the benefits and detriments of filing an appeal and made a reasonable effort to determine Petitioner's wishes. If the attorney ignored his client's wishes to appeal the case; then he has acted unreasonably. Finally, if counsel did not consult with Petitioner about the appeal, the court must determine whether the attorney had an affirmative duty to consult with his client regarding the appeal. Counsel has an affirmative duty when there is reason to think (1) any rational defendant would want to appeal, or (2) his client reasonably demonstrated an interest in appealing. Id at 479-480. Furthermore, the court must hold an evidentary hearing to establish facts that occurred off the record before the court can render a full and fair determination of this claim. Rule 8 of the rules governing § 2255 proceedings. Moreover, the First Circuit has stated, the proper remedy is a resentencing to enable Petitioner the opportunity to perfect an appeal. See Batista-Zabala v. U.S., 912 F. Supp 244, 247 (D. Puerto Rico 1997) (Citing Cases). Ineffective assistance of counsel denied Petitioner this most basic right.

## THE CORRECTION OF SENTENCE AT RESENTENCING

The First Circuit ruled in Maldonado v. U.S., 242 F.3d 1 (2001), the District Court has the power to vacate, set aside, or correct a sentence that was subject to collateral attack because negligence of counsel thwarted appeal from original conviction. Ct. Bonneau, 961 F.2d at 23 (1st Cir. 1992).

Petitioner will conclusively demonstrate that he is entitled to a 67 month correction, This correction can be imposed at the resentencing to reopen the appellate 10 day window.

**CLAIM TWO**

This claim challenges the voluntary and intelligent character of the guilty plea and is based on the advice received from counsel was not within acceptable standards. Tollet v. Henderson, 411 US 258, 267 (1973).

After Petitioner's pretrial motions were denied, Attorney Bevilacqua obtained a verbal plea offer. Petitioner requested the weapon violation be dismissed in exchange for his plea. Bevilacqua returned a few days later and stated the prosecutor would not dismiss the weapon violation.

Petitioner communicated a direct request to appeal the pretrial **motions.** Fed. R. Crim. P. 11(a)(2).

(INTENTIONALLY LEFT BLANK)

Bevilacqua stated firmly that Chief Judge Torres had ordered, to preserve denied pretrial motions, defendants must go to trial. Moreover, Bevilacqua recommended the unconditional plea offer because the pretrial motions had already been determined against Petitioner. In simple words, Bevilacqua made no efforts to negotiate a conditional plea.

The issue is not the merits of the pretrial motions, but whether the guilty plea was made knowingly and voluntarily with the advice of competent counsel. Tollet, 411 US at 265.

The foundation for this claim lies in Belivacqua's statement

that Chief Judge Torres does not permit conditional pleas preserving denied pretrial motions for direct appeal. Should this off-the-record statement be a truthful fact than Petitioner has no challenge to his plea. However, if the statement is not true fact for events within the jurisdiction of the District Court, this claim must be evaluated under the two part standard set forth in Strickland v. Washington, supra, 466 US at 687.

Fed. R.Crim.P.11(a)(2) provides:

> With the approval of the court and the consent of the government, a defendant may enter a conditional plea of guilty or nolo contendre, reserving in writing the right, on appeal from the judgement, to review of the adverse determination of any specified pretrial motions. A defendant who prevails on appeal shall be allowed to withdraw the plea.

Therefore, in order to reserve an issue for appeal after a guilty plea, a defendant must obtain the approval of the court and the consent of the government, and he must reserve the right to appeal in writing. Fed. R. Crim.P.11(a)(2); but see U.S. v. Markling, 7 F.3d 1309, 1313-14 (7th Cir. 1993) (upholding conditional plea despite absence of written plea agreement where record revealed unequivocal assent by the government) cert. denied, ----- U.S.-----, 115 S.Ct. 1327, 131 L.Ed.2d 206 (1995). Both the approval of the court and the consent of the government must be clear and "not left to equivocal inference". U.S. v. Mann, 451 F.2d 346, 347 (2nd Cir. 1971) (per curiam); but see U.S. v. Burke, 517 F.2d 377,379 (2nd Cir. 1975)(imputing consent to the government where the prosecutor remained silent after defendant expressed desire to

condition guilty plea on right to appeal and judge indicated willingness to approve a conditional plea). The issues preserved for appeal must be framed with precision and stated with specificity. See U.S. v. Pinto-Mejia, 720 F.2d 248, 256 (2nd Cir. 1983) (stating that the parties must use "care and precision in framing the issues to be preserved"), modified, 728 F.2d 142 (1984).

Moreover, a defendant must reserve the right to appeal at the time of the plea. "We have never allowed a defendant, after a guilty plea and sentence, to reserve the right to appeal." U.S. v. Sykes, 697 F.2d 87,89(2d Cir. 1983) Absent exceptional circumstances, such as where the parties execute an agreement reached prior to entering the plea, this Court will not recognize an attempt to reserve the right to appeal nun pro tunc. See id. (recognizing that the Court of Appeals has the power to restore jurisdiction to district court to amend plea agreement but declining to do so where the record indicated that the parties had reached an agreement regarding appeal after the guilty plea and sentence). In short, the failure to follow the procedures set forth in Fed.R.Crim.P.11(a)(2) will result in a valid guilty plea waiving all nonjurisdictional defects in the proceedings below. See U.S. v. DePoli, 628 F.2d 779, 781 (2d Cir. 1980)(concluding that failure to follow procedures established by the law of the Circuit resulted in waiver.)

Petitioner pleaded guilty with the assistance of counsel. However, Bevilacqua made no effort to negotiate Petitioner's requested conditional plea; did not file any motions to preserve or request a conditional plea from the trial judge; did not obtain any opinion from the government; did not even mention

Petitioner's conditioned plea request during the 3 separate and distinct sentencing sessions. Furthermore, Petitioner was prejudiced by Bevilacqua's statement. Trial would have preserved the pretial motions and the sentence as imposed would have been no greater than the terms received. Petitioner's plea was not knowingly, intelligently or voluntarily rendered with the advice of competent counsel. The court must consider the totality of all the circumstances to determine whether Petitioner's plea was withing the framework of Rule 11 concerns. U.S. v. Hernandez-Wilson, 186 F.3d 1,12 (1st. Cir. 1999).

Nevertheless, the record requires expansion to determine the validity of this claim. As a consequence, an evidentiary hearing under Rule 8 of the rules that govern § 2255 proceedings is requested pursuant to circuit case law doctrine.

More importantly, Petitioner would have asserted the following facts in support of his claim that valid facts and law facilitated a conditional plea that only a direct appeal could have resolved:

## ADVERSE FACT FINDING

(1) It must be remembered that the government had previously obtained a search warrant for another residence involving Petitioner on January 29, 2003. This warrant was supported by the same (in pertinent part) affidavits as the warrant of February 9, 2003. A comparison of the two warrant facts paints the same scenario for both warrants. However, the timely warrant of January 29, 2003 was never executed. See warrant documentation of 1/29/03. Exhibit 4.

(2) The government had obtained the intercepted warrant information on 2-8-03 at about 12:30 p.m., but did not seek the warrant until 10 p.m. on 2-9-03. See warrant documentation of 2-9-03. Exhibit 5.

The question becomes: What prevented the government from completing or obtaining the warrant for 33 hours?

The affidavit information did not change from the facts obtained on 2-8-03. Moreover, the warrant was identical to the previously obtained warrant of 1-29-03. The answer: Lack of Probable Cause!

The question arises: Why did the agents leave AUSA Rogers' office and return to the Petitioner's residence without completing or obtaining the warrant? It is well settled that the AUSA would not issue her approval without additional information. So the agents left to obtain the needed facts.

It must also be remembered that the wiretap warrant expired that same night at 12:00 midnight, 2-9-03. A third intercept

was highly unlikely because two intercept authorizations had not produced the results professed in the applications. Solution: Violent entry without exigent circumstances; secure the drug evidence; but do not mention the illegal results for fear of a Franks ruling; and obtain untainted warrant.

The basis of these facts lay in an evidentiary hearing and the testimony of AUSA Rogers who recused herself from the suppression hearing and was never called as a witness.

Procedurally, the district court abused it's discretion when it denied in part evidence obtained during an unlawful entry. The court never determined whether agents would have obtained the search warrant had they not found the cocaine, money and weapon in the residence. The warrant of 1-29-03 went unserved because the certainty of evidence was unavailable even though a timely warrant had been authorized. A second warrant without results and an unobtainable third intercept warrant would have been devastating to the HIDTA concept. Therefore, violent forced entry with no mention of the secured cocaine and weapon evidence to the Magistrate Judge.

Petitioner's § 2255 challenge is the District Court's fact findings and conclusions of law. Petitioner avers that a clear reading of the record reveals erroneous fact finding and conclusions of law were an appealable issue denied by ineffective assistance of counsel's failure to condition his plea agreement or file an appeal notice. Petitioner argues that Chief Judge Torres alleged statement, if true, is bias that invalidated his plea to a conditional plea that falls within Rule 11 concerns, and is the focus of the ineffective claim.

## CLAIM THREE

A criminal defendant is entitled to specific performance of an agreement which he enters with the government which induced his guilty plea. Santobello v. New York, 404 US 257, 262 (1971); U.S. v. Riggs, 287 F.3d 11, 11 (1st. Cir. 2002) (Citing U.S. v. Velez Carrero, 77 F.3d 11, 11 (1st. Cir. 1996) ("Because plea bargaining requires defendants to waive fundamental constitutional rights, we hold prosecutors engaging in plea bargains to the most meticulous standards of both promise and performance.")

## BREACH OF PLEA AGREEMENT

When the prosecution's statements regarding the presentence investigation are inconsistent with the stipulated plea agreement facts uttered at the plea colloquy prior to Petitioner's entry of his guilty plea, the prosecution has breached the agreement. See Riggs, 287 F.3d at 225. However, unlike Riggs, Petitioner's attorney objected to the additional evidence that increased his client's sentence. Nevertheless, the court based it's decision to include additional evidence under the preponderance of the evidence standard. Exhibit 10 at pages 40-41.

The solemnization of a plea agreement does not preclude the prosecution from disclosing pertinent information to the

sentencing court. That rule notwithstanding, the prosecutor entered into a binding agreement with Petitioner to restrict facts upon which the substantive drug offenses were based. The plea agreement stipulated the total weight involved in counts I and II was 8,954.06 grams of cocaine and seized currency. At the plea colloquy, the prosecutor stipulated that the seized currency totalled $115,000. Moreover, the stipulated money converted to kilograms of cocaine revealed a total of less than 15 kilograms for counts I and II. The stipulation limited the amount of cocaine involved in the offense was violated, and the plea agreement breached, when the prosecutor introduced additional evidence through the presentencing report that the drug amount totalled in excess of 15 kilograms of cocaine. The additional evidence known to the prosecutor prior to the signing of the agreement was specifically precluded from the plea agreement and plea colloquy. Consequently, the prosecutor violated his agreement at the sentencing hearing when it presented evidence obtained through wiretapped communications. However, the rules of evidence do not govern a sentencing proceeding, and are inapplicable to the examination of whether the prosecutor breached a Rule 11 plea agreement.

In this case, like Riggs, 287 F.3d at 224-225, the government fell woefully short of satisfying these meticulous standards. Although, Petitioner signed a plea agreement that stipulated his guideline range will be determined, in part, upon the quantity of "cocaine seized (8954.06 grams) and seized US Currency." See Exhibit 7 at page 3.

At the plea colloquy, "the government stipulated the facts to be proven had Petitioner proceeded to trial", as follows:

> The government: Mr. Montegio's first floor apartment was searched pursuant to a search warrant. On the kitchen counter, agents found approximately nine kilograms of cocaine. There was $114,000 in United States currency on the counter. Also on the counter was a duffel bag containing $900.00 in United States currency. See Exhibit 8 at page 19, lines 2-11.

More significantly, this court accepted the stipulated facts and accepted Petitioner's guilty plea based upon the stated case facts. See exhibit 7 at pages 20, 21.

## THE INITIAL SENTENCING

On October 31, 2003 the District Court, after reviewing the initial presentencing report stated:

> The Court: Now, the presentence report provides that the total offense level in this case after the adjustment for the acceptance of responsibility is a 32, and the criminal history category is 3, and I have not received any objections to the report from either the government or the defendant; is that right?
> The Prosecutor: That is correct, your Honor.
> Petitioner's Attorney: Correct, your Honor.

See Exhibit 6 at page 3. The District Court also stated that "as the guidelines are currently applied under the presentence report of a 32 offense level and a category 3, a guideline sentence is 151 months to 188 months with the additional five years on count IV." See exhibit 6 at page 10.

However, the District Court raised the question of an upward departure based upon a managerial role, not specified in the plea agreement under stipulated facts, or at the plea colloquy when the District Court accepted Petitioner's plea. See exhibit 6 at pages 4 and 5.

The prosecutor requested an additional period of time to prepare a memorandum of law and the District Court continued the sentencing.

## THE SECOND SENTENCING

At the sentencing, April 4, 2005, the government relied upon the presentencing report's recommendation that 11,744 grams seized during the course of the investigation had been attributed to Petitioner. Moreover, the report documented the seizure of $313,700 US currency from other sources and converted that amount to represent 14,259 additional grams of cocaine. The aggregated amount of cocaine now involved 26.003 kilograms of cocaine that set the base offense level at 36, a guideline range for 15 to 50 kilograms of cocaine.

Petitioner's attorney objected to the additional monies seized ($199,000) that was not referenced in the indictment, at the time of the plea colloquy nor the plea agreement. See exhibit 9: Sentencing transcript at page 4. "I have just received a new PSI version that includes an additional $199,000 attributed to defendant."

The record reflects the new PSI version described the contents of two boxes containing $198,700 and Montegio's fingerprint on the tape securing one of the boxes. Exhibit 9 at page 33.

> The Court: All right, It [PSI] doesn't include the facts of what was taken from the...it's what I thought. It doesn't include the facts of the money taken from Olivares' apartment. This part of the Prosecutor's version was part of the record, I believe, in the [Olivares] forfeiture case, but it was not part of the plea colloquy. And just because it is in part of the prosecutor's version, that doesn't make it part of the record.

The Court was not prepared to accept the prosecutor's new version as the basis for a finding of fact and Petitioner's oral objection in light of Booker and Blakely. Exhibit 9 at page 36. The Court continued sentencing.

**THE THIRD SENTENCING**

At the sentencing of April 8, 2005, this Court accepted the government's new version of events. The Court ruled the $198,000 taken from Jennifer Olivares' residence was drug proceeds to be attributed to Petitioner, based upon a single latent print from a black tape segment sealing a box containing a portion of the $198,000. The latent print was identified as a known comparison of Petitioner. See Exhibit 10 at page 16. "The fingerprint found on the boxes, I believe establishes to true preponderance of the evidence standard that $198,000 was proceeds." See Exhibit 10 at page 40.

## THE FINGERPRINT EVIDENCE

Petitioner's attorney objected to the fingerprint evidence and argued, "it leaves much to speculation, your honor, as to how that print arrived on that particular box."

> Mr. Bevilacqua: Did he hold the tape and give it to somebody who eventually took it and used it? There are no other fingerprints found anywhere else on the box, on the side or anywhere else on the tape indicating when someone would grab something and hand something to someone. See exhibit 10 at page 37.

> The Court: Okay, Thank you. All right. I'm now going to rule on these issues with respect to role and relevant conduct. See Exhibit 10 at page 39.

Although, the rules of evidence do not apply at the sentencing phase, the Supreme Court has charged the trial courts with a gatekeeper function to assess the reliability and helpfulness of proferred expert testimony. Daubert v. Merrel Dow Pharmaceuticals, Inc., 509 US 579 (1993); Kumbo Tire Co. v. Carmichael, _____ US _____ (1999). Here the district court made no effort to ensure the reliability of the proffered fingerprint evidence of Criminalist Edward T. Downing, University of Rhode Island. Exhibit 10 at page 16.

More significantly, the Prosecutor filed a motion to compel Petitioner's full case fingerprints on March 7, 2003. See exhibit 11 : The plea was signed on August 6, 2003 and the colloquy held on August 11, 2003, however, the prosecutor failed to raise the additional seized monies based on the sole fingerprint for 20 months, until April 4, 2005. See Exhibit 9 at page 23.

Without any testimonial evidence to support such a finding, preserved by objection, raises reasonable doubt. For example:

> In Heit v. U.S., 365 F.2d 504 (1966), an automobile had been broken into and some contents stolen. Fingerprints of the defendant were found on the inside of an open vent window. Since the only evidence were his fingerprints and there was no testimony as to their probable age, it was reasoned that the prints could have been innocently impressed. Holding that the prints raised only a suspicion and that guilt must be established beyond a reasonable doubt, the conviction was set aside.

> In Borum v. U.S., 380 F.3d 595 (1967), a coin collection was stolen. Fingerprints on some of the glass jars containing the coins. There was evidence the prints could have been on the jars for an indefinite period of time. Since no evidence was introduced showing the jars were generally inaccessible to the Defendant, the fingerprints may have been innocently imprinted upon them. The conviction was set aside on the grounds the verdict was based upon speculation.

More recently, a fingerprint latent was recovered from a terrorist bomb fragment in Spain. An FBI expert determined the latent positively compared to a US Citizen. Three additional FBI experts confirmed the reported results. The US citizen was arrested and held without bond until it was determined that Interpol fingerprint experts discovered the FBI's conclusion was erroneous. The true culprit was arrested in Spain and the US citizen was released.

The District Court placed great weight upon the fingerprint evidence. See Exhibit 10 at page 35:

> The Court: All right, Just very briefly, I think I've seen all the evidence and read the transcripts that relates the $198,000 from Olivares' apartment to the defendant.

Moreover, the PSI also attributed 2.7 kilograms of cocaine Petitioner. This court ruled that it was not convinced that the cocaine seized from the Villegas apartment should also be counted. Exhibit 10 at page 40. Nonetheless, this court's ruling placed Petitioner in the 15 to 50 kilograms of cocaine at level 36.

Petitioner intended for the stipulations at the plea colloquy to bind the government upon his signing of the plea and the court's acceptance of the stipulated facts determined the court's pronouncement of guilt to those factors.

The government supported the information contained in the presentencing report by declaring that its later investigation revealed the amount of cocaine involved was actually in excess of 15 kilograms. This information was specifically precluded at the plea colloquy and from the district court when it accepted Petitioner's plea. Moreover, was not part of the original presentencing report investigation. Consequently, the government violated its agreement at the final sentencing. See U.S. v. Boatner, 966 F.2d 1575, 1579 (11th Cir. 1992). More importantly, effective counsel would have moved to withdraw Petitioner's plea to less than 15 kilograms, because the prosecutor's failure to abide by the plea agreement, even if it did not affect the sentence, is not harmless error. See U.S. v. Velez-Carrero, 77 F.3d 11 (1st. Cir. 1996).

A breach of plea agreement is remedied by either "specific performance of the plea agreement, in which case Petitioner should be resentenced by a different judge or...the opportunity to withdraw the plea." Id Carrero, 77 F.3d at 12, citing U.S. v. Canada, 960 F.3d 263, 271 (1st. Cir. 1992)

**CLAIM FOUR**
**INVOLUNTARY PLEA**

Generally, a defendant who pleads guilty unconditionally while represented by counsel may not assert independent claims relating to events prior to entry of the guilty plea. "He may only attack the voluntary and intelligent character of the guilty plea by showing that the advice he received and accepted from counsel was not within acceptable standards." Tollet v. Henderson, 411 US 258, 267 (1973). Moreover, "There was a reasonable probability that, but for counsel's errors, Petitioner would have not pleaded guilty and would have insisted on proceeding to trial." quoting Hill v. Lockhart, 474 US 52, 57 (1985).

Here, Petitioner's plea became involuntary. Had he known the prosecution would assert additional cocaine facts at sentencing and the district court acceptance of those additional facts, he would have not pleaded guilty, and proceeded to trial. His plea was not knowingly and intelligently given when the prosecution breached its agreed upon stipulated facts after signing the plea agreement. This court must consider the totallity of all the circumstances to determine whether Petitioner's plea was voluntary, intelligently and knowingly given within the framework of Rule 11 concerns. U.S. v. Hernandez-Wilson, 186 F.3d 1,12 (1st. Cir 1999); U.S. v. Cutac-Crespo, 47 F.3d 1, 3 (1st. Cir 1995).

A court pronouncing sentence under the guidelines applies the "offense guideline section...most applicable to the offense of conviction." U.S.S.G. § 1B1.2(a). There is one "limited" exception to the general rule, § 1B1.2, comment, n1, consisting of the following proviso to § 1B1.2(a):

> Provided, however, in a case of conviction by a plea of guilty or nolo contendre containing a stipulation that specifically establishes a more serious offense than the offense of conviction, [the court shall apply the guideline most applicable to the stipulated offense.]

This proviso does not apply to Petitioner who pled guilty to violating 21 U.S.C. § 841(a) but did not enter into any stipulation establishing a more serious offense. See U.S.S v. Casey, 158 F.3d 993, 996 (8th Cir. 1998).

See USSG § 1B1.2(a); Braxton v. U.S., 500 US 344, 346 (1991)(for the proviso in 1B1.2(a) to apply, there must be not simply a stipulation, but a stipulation that "specifically establishes" a more serious offense). Thus, even assuming that Petitioner's agreement to facts constituted a "stipulation" for purposes of § 1B1.2(a), unless it "specifically established", a more serious offense (15 to 50 kilograms of cocaine, level 36 ; the sentence based upon guideline for that offense cannot stand. Id at 349. Petitioner pled guilty to the prosecutor's stipulation of approximately nine kilograms of cocaine and $115,000 seized US Currency converted under U.S. v. Gerante, 891 F.2d 364 (1st. Cir. 1989) to a total of less than 15 kilograms

of cocaine. The stipulated offense facts constitute an offense level of 5 to 15 kilograms of cocaine, level 36. Note: the guidelines were amended after the Braxton case was litigated, and now requires that the more serious stipulation appear in the plea agreement. Simply put, Petitioner did not plea to a more serious offense level. Should the government now argue that the indictment was open-ended (seized currency) requires this Court to determine whether Petitioner "knowingly and voluntarily" pled to a more serious offense than the prosecutor stipulated at plea colloquy, the altered facts at sentencing invalidated the stipulated facts of the agreement. Petitioner did not plea to the 15 to 50 kilograms guideline range at level 36. Had Petitioner known the prosecutor's intentions, he would not have signed the agreement but would have proceeded to trial.

## CLAIM FIVE

## THE SENTENCING COURT'S RELEVANT CONDUCT ERROR

Petitioner avers the district court committed error when it based the guideline sentencing range § 1B1.2 beyond the stipulated guilty facts to assess the imposed sentence:

> The court: It's my view that, with respect to the issue of relevant conduct, that the government has proven sufficiently that the cash found at defendant's apartment during the arrest is drug proceeds. In addition, I am convinced that the $198,000 from, taken from Jennifer Olivares' apartment is also proceeds...
>
> The net effect has of that, however, has no bearing on the calculation done by the Probation Office, you're still within the range of 15 to 50 kilograms under the guideline. See Exhibit 10 at page 39 to 41.

The sentencing guideline manual in effect at the time of Petitioner's 2004 sentencing included sentencing guideline amendment 591 that clarified the application of § 1B1.2 (applicable guideline) and § 1B1.3 (relevant conduct).

In the case of a particular statute, 21 U.S.C. § 846 as charged in Count One, that proscribed a variety of conduct that might constitute the subject of different offense guidelines, the statutory index may specify more than one guideline for that particular guideline, and the court will determine which of the referenced guideline sections is most appropriate for the offense conduct charged in the count of which the defendant was convicted.

The offense guideline section is the foundation of the sentence. Amendment 591 cites U.S. v. Saavedra, 148 F.3d 1311 (11th Cir. 1998), a defendant's unchanged relevant conduct is actually irrelevant to determining the sentencing guideline application to the defendant's offense; such conduct is properly considered only after the applicable guideline has been selected when the court is analyzing the various sentencing considerations within the guideline chosen, such as the base level offense, specific offense considerations, and any cross reference.

The amendment modified § 1B1.1(a), 1B1.2(a), and the statutory index's introductory commentary to clarify the interrelationship among these provisions. The clarification was intended to emphasize that the sentencing court apply the offense guideline referenced in the statutory index for the statute of conviction. Furthermore, the amendment deleted Application Note 3 of 1B1.2 (Applicable guidelines) that provided it would be appropriate for the court to consider actual conduct of the offender, even if such conduct did not constitute an element of the offense.

The District Court based the aggregated amount of cocaine involved an offense of at least 15 kilograms, but less than 50 kilograms of cocaine, § 2D1.1(c)(3), a base level offense of 34. See exhibit 12 at page 6, the PSI at paragraph 17.

The record clearly reveals the sentencing court accepted and adjudged Petitioner guilty to an aggregated amount of less than15 kilograms but more than 5 kilograms of cocaine. § 2D1.1(c)(4),

at base level 32. See exhibit 8 : plea colloquy at pages 19 to 21. More importantly, the court stated at the initial sentencing of October 31, 2003;

> The Court: --"as the guidelines are currently applied under the presentence report of a 32 offense level and a category 3, guideline sentence is 151 to 188 months"-- See exhibit 6 at page 10.

Once the court accepted the agreement, its only recourse was to reject the agreement if it found the negotiated facts unsatisfactory at sentencing. Once accepted, the agreement is binding, notwithstanding departures from the applicable guidelines. U.S. v. Moure-Ortiz, 184 F.3d 1,3 (1st Cir. 1999). The District Court erred when it misapplied an incorrect guideline § 2D1.1(c)(3) level 34 for relevant conduct rather than the guideline corresponding to stipulated facts and adjugment of guilt. § 2 D1.1(c)(4), level 32.

> The COurt (at sentencing): I believe it is a sentence which conforms to the guidelines given the calculations as I've determined them today. See exhibit 10 at page 60.

Because the upward departure was impermissible, § 2255 gives this court the"power to vacate, set aside or correct the sentence." 28 U.S.C. § 2255. In accordance with First Circuit precedents, the matter should be remanded for resentencing under § 2D1.1(c)(4) level 34 at the low end of the guidelines, 151 months.

## CLAIM SIX : RULE 11 VIOLATIONS

In the plea agreement and at the plea colloquy the government did not raise any role adjustment pursuant to § 3B1.1. See exhibit 8 at paragraph 2(b), page 2, 2 point downward departure, § 3E1.1. At the first sentencing of October 31, 2003, the district court noted the initial presentencing report at paragraph 19 did not contemplate for a role adjustment in the offense. See exhibit 6 at page 4 and 5. The district court requested the prosecutor to respond and the prosecutor quickly requested a continuance to provide the court with a memorandum of law, because it did contemplate any role adjustment, and Petitioner's counsel did not object.

Petitioner raises two points of law:

1. Because the government did not incorporate a role adjustment under § 3B1.1 in it's agreement, Petitioner accepted this fact as an inducement for his plea.

At the sentencing of 4-8-05, the prosecutor submitted a new presentencing report that included "adjustment for role in the offense" that warranted a 4 level increase supported by it's sentencing memorandum. Additionally, it noted the defense had occasion to review the memorandum and conceded to the 4-level adjustment. See exhibit 12 at page 6, paragraph 19.

Petitioner argues that the plea agreement's silence to any role adjustment, included the prosecutor's silence to any role adjustment through the presentencing report and at sentencing. See _Carrero_, 77 F.3d at 11,12 (1st. Cir. 1996)(vacating sentence and remand to resentencing by a different judge.)

2. More importantly, Rule 11 does not allow the district court to pick and choose which portions of the agreement it wishes to enforce. Once the district court realized that a role adjustment was a valid missing sentencing factor, its only option was to accept the plea agreement in its entirety and sentence Petitioner without a role adjustment or allow Petitioner to withdraw his plea. Nevertheless, the district court performed neither function, and sentenced Petitioner to a 2 level role adjustment enhancement.

Petitioner is entitled to the accepted plea agreement without any role adjustments. The exacerbated deficient performance of counsel's failure to oppose the role adjustment is clearly supported by the record. Moreover, the district court acknowledged prosecutor's intended non-role adjustment at the plea colloquy when it accepted Petitioner's plea. The prosecutor's failure to abide by the plea bargain was not a mere "technical" breach. See Riggs, Supra, 287 F.3d at 225 (citing cases)

The remedy is the plea agreement's non-role adjustment and a two point reduction at resentencing, or allow Petitioner to withdraw his plea.

## CLAIM SEVEN

## CONSTITUTIONAL OBJECTION

The Sixth Amendment is violated if a sentencing judge imposes a sentence under the guidelines based on the determination of a fact (other than a prior conviction) that was not found by a jury or admitted by the defendant. U.S. v. Booker, ____ U.S. ____(2005)(Stevens, J. opinion of the Court) (finding that Blakely v. Washington, 542 US 296 (2004) and Apprendi v. New Jersey, 530 US 466(2000) apply to the U.S.S.G. "When a defendant pleads guilty, the state is free to seek judicial enhancements so long as the defendant either stipulates to the relevant facts or consents to judicial findings." Blakely, 542 US at _____.

The issue before the court is whether the District Court abused its discretion when it applied a standard of proof to determine facts at sentencing that offended Petitioner's right to due process. A Fifth Amendment challenge involves a constitutional protection of "surpassing importance in the proscription of any deprivation of liberty without 'due process of law'", quoting Apprendi, 530 US at 477 (the Fifth Amendment provides that a criminal defendant is entitled to be determined that he is guilty of every element of the crime with which he is charged "beyond a reasonable doubt"); In re Winship, 397 US 358, 361 (1970).

The Due Process clause is implicated whenever a judge determines a fact by a standard lower than "beyond a reasonable doubt" if that factual finding would increase the punishment

above the lawful sentence it could have imposed absent that fact. See U.S. v. Pimental, 367 F.Supp 2d 143, 152 (D.Mass 2005) (Stating that even if the Sixth Amendment jury trial guarantee is not directly implicated because the regime is no longer a mandatory one, the Fifth Amendment's Due Process is").

> The Court: § 3B1.c provides for a two level increase for smaller criminal enterprises in which one is an organizer, a leader, a manager, a supervisor in criminal activity that does not fit within the definition of either A or B.
>
> And while it is a close call, I am concluding that the defendant is, should be given a role adjustment of two points as opposed to a role adjustment of four point.
>
> So Paragraph 19 will be adjusted to provide a role adjustment of two points.
>
> So the net effect of that is with 34/3, the guideline range is 188 months to 235 months on counts one and two. See exhibit 10 at page 45.

However, this was a net increase of 67 months for additional facts, not stipulated in the plea agreement, at the plea colloquy, neither admitted by Petitioner, nor objected to by Petitioner's attorney and determined by the District Court by a standard lower than, "beyond a reasonable doubt". Petitioner's entry of guilty plea and cocomitant waiver of a jury trial cannot correspondingly constitute a waiver of the burden placed on the government to prove its case. See Schrinor v. Summerlin, 542 US 348 (2004). A sentencing court's discretion is non limited to post Booker (addressing sentencing factors/element distinction and identifying constitutional safeguards and the burden of proof). Petitioner cannot be sentenced, consistent with due process, to a term of imprisonment that exceeds the extent of the indictment, and his admissions to stipulated facts. Accordingly, the advisory guideline sentence is limited to facts proven beyond a reasonable doubt or admitted by Petitioner at level 30, 121-151 months for less than 15 kilograms but more than 5 kilograms of cocaine. This includes the 2 point departure for timely acceptance of responsibility and 4 point departure for the corrected guideline range.

CONCLUSION

Petitioner has conclusively demonstrated his claims are not frivolous nor contradicted by the record. Moreover, an evidentary hearing is required to ensure Petitioner's entitlement to one full and fair complete § 2255 proceeding under the law.

Wherefore, Petitioner prays this Honorable Court will grant a resentencing to impose a legally correct sentence and reopen the 10 day appellate window; or withdraw Petitioner's guilty plea and permit Petitioner plead anew; or grant an evidentiary hearing.

Respectfully Submitted,

Shawn Montegio
Reg # 05264-070
FCC Medium, B-1
PO Box 1032
Coleman, FL 33521-1032

CERTIFICATE OF SERVICE

I hereby certify that a correct and true copy of the foregoing § 2255 motion was placed into the prison legal mailbox to:

Mr. Kenneth Madden
US Attorney's Office
50 Kennedy Plaza
Providence, RI 02930

On this date 3-29-06

Shawn Montegio